UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WESTERN ENERGY
OPPORTUNITIES II, LLC, d/b/a
WESTERN ENERGY REGIONAL
CENTER,

                     Plaintiff,

– against –

FINALIS SECURITIES, LLC; EB5
ENERGY FUND I, LP d/b/a EB5
MARKETPLACE; EB5 ENERGY
HOLDINGS, LLC; RUPY CHEEMA;
KURT EDWARD REUSS; and ABC
CORPORATIONS 1 through 10,

                     Defendants.

**OPINION & ORDER**

24-cv-2565 (ER)

R AMOS, D.J.:

      Western Energy Opportunities II, LLC d/b/a Western Energy Regional Center ("Western Energy") brings this action against Finalis Securities, LLC ("Finalis"); EB5 Energy Fund I, LP d/b/a EB5 Marketplace ("EB Marketplace"); EB5 Energy Holdings, LLC ("EB5 Energy"); Rupy Cheema; Kurt Edward Reuss; and ABC Corporations 1 through 10. Western Energy asserts 7 claims: (1) violation of RICO 18 U.S.C. § 1964 (c) against all defendants; (2) misappropriation of trade secrets under the Federal Defend Trade Secrets Act ("DTSA") against all defendants; (3) misappropriation of trade secrets under New York law against all defendants; (4) deceptive business practices under New York Gen Bus. L. § 349 against Finalis, EB5 Marketplace, EB5 Energy, and Reuss; (5) breach of contract against Finalis, Reuss, and EB5 Marketplace; (6) in the alternative breach of contract against Finalis as Principal of Reuss; and (7) breach of the implied covenant of good faith and fair dealing against Finalis, Reuss and EB5 Marketplace. Before the court is Finalis' motion to dismiss the first amended complaint. Doc. 49. For the reasons set forth below, the motion is GRANTED.

I.  **BACKGROUND**

   A. **Factual Background**

Western Energy is a Delaware limited liability company designated as an EB-5 Regional Center in 2016 by the United States Citizenship and Immigration Services. ¶¶ 2, 15.[1]  EB-5 is a program that was created by Congress, with the passing of the Immigration Act of 1990, with the goal of stimulating the United States economy through foreign entrepreneurial investment. ¶ 12.  The EB-5 program allows foreign investors, who meet the program's requirements to obtain an EB-5 visa, which entitles the holder to obtain a conditional Green Card, and after two years a full Green Card. ¶ 13.  After five years of Green Card status, investors may apply for full United States citizenship. *Id.*  To qualify for the EB-5 program, investments in qualified EB-5 projects must be $800,000 or greater, and the investment must facilitate the creation of ten jobs in the United States. *Id.*  Western Energy accrues profits from EB-5 investments and uses the profits to pay back the investor's capital investments plus interest.[2]  ¶¶ 20, 21.  Western Energy had a highly successful investment period from 2016 into 2017, referred to as the "2017 Offering," where $3,000,000 was raised in a single offering from 6 investors, generating revenues over the course of the following 5 years of approximately $4,000,000. ¶ 26.

Following the 2017 Offering, Western Energy worked on establishing its business model, building contacts with investors, and instituting precautionary tools to protect its trade model. ¶ 27.  Western Energy's alleged trade secrets, as established during this period are as follows:

- Information relating to the varying sizes and types of oil wells in Oklahoma;
- Data relating to the historical production and financial performance of the same;

---

[1] Unless otherwise noted, citations to "¶ __" refer to the amended complaint, Doc. 41.

[2] Western Energy uses the investments to fund oil and gas production in Oklahoma.  Based on Western Energy's status as an EB-5 Regional Center, investors have the opportunity to apply for EB-5 status.  In addition, they receive a lien on the assets and cash flow funded by its investment.  They also get returns funded through cash flow generated by the gas and oil wells that they invested in.  ¶¶ 16, 17.

- Information relating to the geographical features and locations in Oklahoma that indicate a likelihood of a productive oil well;
- Information relating to the selection of oil and gas operators in Oklahoma;
- Proven strategies for optimizing an oil and gas investment to create jobs, and therefore, meet the job creation requirements for EB-5 investor visa applications;
- Strategies for diversifying portfolios of oil wells to maximize returns for both Western Energy and investors;
- Data relating to proven oil reserves and the likelihood of similar or differing outcomes with those reserves or in those regions;
- Proven strategies for oil field redevelopment;
- Strategies for optimizing investors' and owners' federal income tax using a specific combination of investment structure, tax incentives, and distributions;
- Information regarding new extraction technologies and the operators that are using them;
- An investment and return structure that shortens the timeline for return of investors' capital;
- Prospectus and other offering documents;
- Marketing materials and strategies;
- Lists of oil and gas operators;
- Contacts at various immigration agencies across numerous eastern Asian countries;
- Due diligence checklists related to the projects, immigration agencies, and vetting of investors. ¶ 28.

Western Energy required all individuals who were to be granted access to its confidential information to sign a non-disclosure and confidentiality agreement or agree to a similar provision in their contract granting said individual access. ¶ 29. Western Energy numbered sets of documents as a way to track their movement and included identifying markers on marketing materials, shared documents in read-only formats, and maintained confidential information in password protected devices/accounts, all in an effort to protect its business model. *Id.*

Once Western Energy was satisfied with the development of its model, the company contacted Finalis, a brokerage firm, in preparation for the undertaking of

another offering. ¶ 32.  Finalis is a Delaware limited liability company that functions as a securities brokerage platform licensed by the Financial Industry Regulatory Authority ("FINRA"). [3]  ¶¶ 3, 32.  Finalis began working with Western Energy in August of 2022, with the goal of generating quicker investments and facilitating connections with prospective investors.  ¶¶ 31-32, 42.  Kurt Reuss[4] served as Western Energy's primary point of contact at Finalis and served as the Placement Agent/Broker of the Placement Agent Agreement ("PAA").[5]  Finalis, Western Energy, and Reuss entered into the PAA in August of 2022, with Western Energy as Issuer, Reuss as Placement Agent, doing business as EB5 Marketplace, and Finalis as the Registered Broker-Dealer.  Doc. 41 ¶ 39; Doc. 41-1.

The PAA stated that Western Energy's goal in working with Finalis was to "conduct an offering to raise up to [$79,200,000.00] from certain prospective qualified investors … each of whom intends to apply for approval from the United States Citizenship and Immigration Services for an I-526 Immigrant Petition by Alien Entrepreneur … through the EB-5 Immigrant Investor Program."  ¶ 41.  Reuss, working through EB5 Marketplace, was appointed to identify, solicit and refer to Western Energy qualified investors with Finalis as a signatory, serving as the Registered Broker-Dealer.  ¶ 42.  Reuss often included his wife, Cheema, in conducting due diligence.  ¶ 52.  Cheema would organize information and documentation requests on behalf of EB-5 Marketplace.  *Id.*  Finalis did not oppose this arrangement and believed that the information provided to

---

[3] FINRA is a self-regulatory organization under the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78a).

[4] In the amended complaint, Reuss' exact title/position within Finalis is not stated.  In Finalis' memorandum in support of its motion to dismiss, they refer to Reuss as an independent contractor, as set forth in the Placement Agent Agreement.  Doc. 52 at 3.  In that agreement, however, Reuss is identified as an independent contractor for Western Energy, but not for Finalis.  Doc. 41-1 ¶¶ 13, 17.  The PAA identifies Reuss as a "registered representative of Finalis Securities LLC."  Doc. 41-1 ¶¶ 13, 17.

[5] As Placement Agent, Reuss was obligated to comply with FINRA rules.  Doc. 41-1 ¶ 5.

4

Cheema would only be used in furtherance of the goals of the PAA. ¶ 58. The PAA also included compensation agreements between Western Energy and Finalis, which stated that Western Energy would pay Finalis on behalf of Reuss.[6] ¶¶ 45.

Section 5 of the PAA stated that Finalis and Reuss must acknowledge that it would have "access to Confidential Information relating to the business of [Western Energy] and the Project, including, but not limited to, sales and marketing information, Offering Documents, financial information, business plans, or other material embodying trade secrets, or other information or technical or business information of [Western Energy] or the Project" and to agree that "at all times from and after the Effective Date to exercise due care and keep in confidence and not disclose or otherwise exploit Confidential Information." ¶ 48. Additionally, in serving as Broker-Dealer, Finalis must comply with all FINRA rules, specifically Rules 3010, 3270, and 3280, which require that Finalis has systems in place to monitor its representatives' outside business activities and assess whether its representative can serve the client adequately. ¶ 59.

Western Energy, thereafter, supplied Reuss and Cheema with various sales and marketing materials, offering documents, financial information, business plans, tax documents and strategies, asset structure and pooling strategies, and lists of industry contacts. ¶ 53. After 6 months, Reuss placed only 4 qualified investors with Western Energy, raising a total of $3.2 million – requiring a restructuring of the offering. ¶ 54. Western Energy alleges this to be a result of Reuss' distraction as he was separately

---

[6] Essentially, Western Energy would pay Finalis a percent of the total amount invested by a qualified investor minus $10,000.00 (the administrative fee charged by Western Energy for each investor introduced by the placement agent). This administrative fee would be paid to Western Energy by the investor within 10 days of the investor's receipt of notice from the USCIS of that investor's I-526 petition. ¶ 46. The PAA also provides that Finalis will be paid a fee of 3.5% of the total capital invested by each qualified investor placed by Reuss which will be paid annually for five years following the placement. ¶ 47.

involved in a scheme with Finalis, Cheema, EB5 Marketplace and EB5 Energy to steal Western Energy's trade secrets and create a competing business. ¶ 55.[7]

Western Energy trusted Finalis due to its industry reputation, SEC registration, FINRA membership, and representations in the PAA and thus turned over confidential information to Finalis, Reuss, and Cheema in order to facilitate their brokerage work. ¶ 58. Peter Reuss, Reuss' son, worked with Western Energy as well, assisting on marketing of the offering. ¶ 64.

Western Energy noticed around the time of this working relationship that an entity named Reuss Capital Group, LLC, believed to be the parent company of the EB5 entities, was sending out marketing materials that were very similar, if not identical, to the ones used by Western Energy and produced by Reuss and his team for Western Energy as per the PAA. ¶ 66.

In approximately April of 2023, Western Energy received information from a marketing agency contact that operated in Ho Chi Minh City, Vietnam, that there was a competing regional center participating in an EB-5 trade show in Ho Chi Minh City. ¶ 67. The contact sent photos to Western Energy of the display booth which depicted the competing regional center as EB5 Energy with Cheema present.[8] ¶¶ 67, 68. At this trade show, EB5 Energy, a subsidiary of EB5 Marketplace run by Reuss and Cheema, was allegedly attempting to raise investments for an oil and gas offering in Oklahoma. ¶¶ 67, 71, 72. EB5 Energy had previously dealt in commercial real estate projects and Western Energy existed as the sole Regional Center dealing in the oil and gas industry in Oklahoma. ¶ 70. EB5 Marketplace's business structure and offering is similar to Western Energy's in the following respects: its list of partners and operators used to find

---

[7] EB5 Marketplace (a Delaware limited partnership) is the business which Reuss and Cheema used to facilitate its work for Finalis. EB5 Energy (a Delaware limited liability company), in contrast, is a company that Western Energy believes is operated by EB5 Marketplace, Reuss, and Cheema, used "as a vehicle to conceal its theft of [Western Energy's] trade secrets." Doc. 41 ¶ 6.

[8] Western Energy's online research revealed that Cheema was leading EB5 Energy. ¶ 68.

6

approved EB5 projects in the oil and gas industry, its formatting in comparison to Western Energy's prior offering, its investors, its brochures, its subscription agreements, and other marketing materials. ¶¶ 74 – 80.

Around the same time as Western Energy's offering, EB5 Marketplace (is believed to have) obtained between 20 to 30 qualified investors, raising between $16 and $24 million. ¶ 82. When Western Energy learned of EB5 Marketplace's offering, it contacted Finalis. ¶ 84. Finalis did not answer the emails from Western Energy and took no immediate steps to investigate or remedy the situation. ¶¶ 85, 86. When Western Energy confronted Reuss on the matter, he did not deny the allegations and instead stated that his wife was running EB5 Energy, not him. ¶ 88. Finalis also entered into an agreement with EB5 Marketplace for the same services that had been arranged between Finalis and Western Energy, using the same business model as Western Energy, as seen in a screenshot taken from EB5 Marketplace's website, under its Rural Energy (Oklahoma) page which states that, "securities are offered through Finalis Securities LLC Member FINRA/SIPC." ¶ 85 (Image 1).

### B. Procedural History

Western Energy filed this suit on April 4, 2024, alleging: RICO 18 U.S.C. § 1964(c), misappropriation of trade secrets under the DTSA, misappropriation of trade secrets under New York law, deceptive business practices under N.Y. General Business Law § 349, breach of contract, and breach of the implied covenant of good faith and fair dealing. Doc. 1. EB5 Marketplace and EB5 Energy answered the complaint on March 10, 2024 and Rupy Cheema and Kurt Edward Reuss answered the complaint on March 24, 2024. Doc. 23; Doc. 33. Finalis moved to dismiss the complaint on July 2, 2024. Doc. 38.

Western Energy amended the complaint on July 23, 2024. Doc. 41. Rupy Cheema, Kurt Reuss, EB5 Marketplace and EB5 Energy answered the amended complaint on August 7, 2024. Doc. 43; Doc. 44. Finalis alone moved to dismiss the

7

amended complaint on August 14, 2024 for failure to state a cause of action as to all claims.  Doc. 49

## II.     LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 503 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halevian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule 12(b)(6) motion, a district court may also consider

"documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. New York University*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F. 3d 104, 111 (2d Cir. 2010)).

### III.  DISCUSSION
#### A.  RICO 18 U.S.C. § 1964(c)

To state a claim for a civil RICO violation, a plaintiff must plausibly allege:  (1) a violation of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of the RICO statute.  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018).  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. §1962(c).  The elements of a §1962(c) violation thus are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Kim*, 884 F.3d at 103.

Although a goal of RICO is to protect the public from corporations being used as "vehicles" for unlawful activity, it is also a key "aim of RICO [] to protect organizations from criminal infiltration," rather than making "them responsible parties."  *USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 327 (S.D.N.Y. 2003) (quoting *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 899 F. Supp. 1187, 1192 (S.D.N.Y. 1995); *see also Rush v. Oppenheimer & Co. Inc.*, 628 F. Supp. 1188, 1194-1195 (S.D.N.Y. 1985) ("Superimposing vicarious liability doctrines on the RICO criminality requirements would in this context permit the 'enterprise' which is the conduit for these activities, to become the defendant by way of imputation, in a transparent attempt to reach a deeper pocket than the actual violator or perpetrator of the predicate racketeering acts.")

9

Finalis moves to dismiss the RICO claim on the basis that Western Energy has not sufficiently pled (1) the existence of an enterprise and (2) that Finalis engaged in a pattern of predicate acts. Doc. 52 at 11-17.

*1. Western Energy Fails to Plead the Existence of an Enterprise*

The key to a successful RICO claim is demonstrating the existence of an enterprise. *BWP Media USA, Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 359 (S.D.N.Y. 2014) ("The heart of any civil RICO claim is the enterprise. There can be no RICO violation without one.") (citation omitted)). A RICO "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). To constitute an enterprise, the "association of individuals" must share a common goal of perpetuating fraudulent conduct in which they "work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citing *First Capital Asset Management., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)). Plaintiffs must demonstrate three structural features: (1) a purpose, (2) relationships among members of the enterprise, and (3) longevity sufficient to permit them to pursue the enterprise's purpose. *D. Penguin Bros. Ltd. v. City National Bank*, 587 F. App'x 663, 667 (2d Cir. 2014). When determining if a plaintiff has sufficiently alleged an association-in-fact RICO enterprise, courts will "analyze the hierarchy, organization, and activities of the alleged association to determine whether its members functioned as a unit. A plaintiff's conclusory naming of a string of entities does not adequately allege an enterprise." *BWP Media USA, Inc.*, 69 F. Supp. 3d at 360 (internal quotation marks and citations omitted). There is, however, a requirement that for a RICO enterprise to be established, the RICO defendant and the RICO enterprise are distinct. *Weaver v. James*, No. 10 Civ. 6609 (NRB), 2011 WL 4472062, at *3 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162-63 (2001).

Further, the mere existence of an enterprise is not sufficient. "One is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" *First Capital Asset Management.*, 385 F.3d at 175-76 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)). Thus, "plaintiffs must also allege that the defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," meaning that the defendant "must have had some part in directing the enterprise's affairs." *Id.* (internal quotation marks and brackets omitted) (citing 18 U.S.C. §1962(c); *Reves v. Ernst & Young*, 507 U.S. 170-177-79 (1993)); *see also D. Penguin Bros.*, 587 F. App'x at 668 (dismissing a RICO claim where the complaint failed to allege that the defendants "acted on behalf of the enterprise as opposed to on behalf of themselves in their individual capacities, to advance their self-interests." (citation, internal quotation marks, and brackets omitted)).

"Neither the Second Circuit nor the Supreme Court have definitively settled the extent to which ordinary respondeat superior principles make a corporation legally liable under RICO for the criminal acts of its employees." *USA Certified Merchants*, 262 F. Supp. 2d at 327. The Supreme Court has, however, indicated that a corporation "can be held liable when the organization itself is being conducted as an illegitimate criminal enterprise or 'in a manner detrimental to the public interest.'" *Id.* (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001); *accord Kovian v. Fulton County National Bank and Trust Co.*, 100 F. Supp. 2d 129, 133 (N.D.N.Y. 2000) ("For purposes of vicarious RICO liability, courts distinguish 'between 'aggressor' corporations that are central figures in the unlawful scheme and 'conduit' corporations that unknowingly facilitate the illegal behavior' and noted that most courts 'have declined to subject the [latter] to RICO liability.'") (quoting *Amendolare v. Schenkers International Forwarders, Inc.*, 747 F. Supp. 162, 168 (E.D.N.Y. 1990)).

RICO is meant to protect organizations from liability in instances where their employees are acting outside of their control and furthering a scheme that does not

11

benefit the corporation itself. *See USA Certified Merchants, LLC*, 262 F. Supp. 2d at 328. If the corporation is not an "active perpetrator of the fraud or a central figure in the criminal scheme" or enterprise, then courts in this district generally do not hold the corporation liable for the actions of their agent or employee. *Id.* (citing *Qatar National Navigation & Transportation Co. Ltd. v. Citibank, N.A.*, 89 Civ. 0464, 1992 WL 276565, *7 (S.D.N.Y. Sep. 24, 1992). A plaintiff must "show that a corporate officer or director had knowledge of or was recklessly indifferent toward the unlawful activity" to demonstrate direct involvement by the corporation. *Id.* Even if the plaintiff can prove active involvement, other factors, such as whether the corporation benefitted from the scheme, must be considered before a court will impose liability against the corporation. *Id.* ("Some courts in this Circuit have imposed RICO liability on a corporation for the acts of its employees based, at least in part, on whether the corporation itself benefitted from the scheme."); *see also Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F. Supp. 213, 236 (S.D.N.Y. 1992) ("Where the employer allegedly benefits from the predicate acts, respondeat superior liability under RICO is appropriate.").

Western Energy claims that Finalis, Reuss, Cheema, and the EB5 entities, together, constitute an enterprise, and that they worked in tandem to "achieve the purpose of stealing plaintiff's trade secrets, establish [] their own offering, and divert [] investors away from [Western Energy]." Doc. 41 ¶ 102. Specifically, Western Energy alleges that it was Finalis' name, reputation, and licensure that put the parties in the position to gain access to Western Energy's trade secrets, making them an integral feature of the "enterprise." *Id.* ¶ 112. Further, Western Energy states Finalis' failure to monitor the actions of Reuss, Cheema, and the EB5 entities was an influential component of the scheme's success.

Finalis counters that Western Energy's RICO claim immediately fails based on Western Energy's inability to demonstrate the existence of an enterprise because Reuss' conduct was within the scope of his employment, violating the distinctness requirement

12

between defendant and enterprise as required under RICO. Finalis further claims that the conduct of the other defendants Cheema and the EB-5 entities, fall outside the scope of Reuss' working relationship with Finalis and thus Finalis was not involved in or aware of it. Finalis also argues that its only contribution to the enterprise alleged is insufficient oversight, which is not enough to meet the standard for a valid RICO claim.

Western Energy claims that Finalis inconsistently frames its relationship with Reuss while Finalis claims that it clearly identifies Reuss as an independent contractor registered with Finalis.[9] Relevant here for purposes of RICO liability is the determination of whether Reuss' work was within the scope of his employment. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("[RICO liability] depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs" (citing *Reves,* 507 U.S. at 185)). The amended complaint alleges no specific acts of misappropriation by Reuss, Cheema, or EB5 Marketplace that fall within the scope of their employment with Finalis, or for the benefit of Finalis. *See Alix v. McKinsey & Co., Inc.*, No. 18 Civ. 4141 (JMF), 2023 WL 5344892, at *11 (S.D.N.Y. Aug. 18, 2023). Thus, the Court is lacking facts to make a determination as to whether an enterprise existed that included Reuss and Finalis.

However, even assuming, without deciding, that Reuss was an employee, it is not enough merely to allege that Finalis failed to supervise Reuss and the other defendants. Some amount of direct involvement in the Enterprise's activities is required, which Western Energy does not sufficiently allege. *See Reves,* 507 U.S. at 177-79*; First Capital Asset Management.*, 385 F.3d at 175–76; *Volmar Distributors. v. New York Post Co.*, 899 F. Supp. 1187, 1193 (S.D.N.Y. 1995) ("RICO only imposes liability on corporations that benefit from the racketeering activity." (citation omitted)). And, even a generous reading

---

[9] Western Energy alleges that "[f]irst, the Agreement calls Reuss an independent contractor, yet Finalis attempts to rebuff [Western Energy's] claims of an enterprise by framing Reuss as an agent or an employee of Finalis" while Finalis asserts that their motion "plainly states that [] Reuss is an independent contractor." Doc. 63 at 20; Doc. 52 at 10.

of the amended complaint gives no indication that Finalis' actions amount to anything other than failing to properly supervise Reuss, Cheema, and EB5 Marketplace. This is not enough to plead that Finalis had any sort of influential, direct role in the alleged Enterprise. *See First Capital Asset Management*, 385 F.3d at 176; *see also Reves*, 507 U.S. at 177-79. Accordingly, Western Energy's RICO claim fails on this ground alone.

### 2. Western Energy Fails to Plead a Pattern of Predicate Acts

Finalis also argues that the RICO claim against Finalis must be dismissed for the independent reason that the Amended Complaint fails to plead a pattern of racketeering activity and instead references only a single predicate act of misconduct (in which Finalis claims it was not involved).

To establish a "pattern of racketeering activity," a plaintiff must plausibly allege that each defendant—not merely the enterprise as a whole—engaged in at least two predicate acts. *Buhannic v. American Arbitration Association*, No. 18 Civ. 2430 (ER), 2019 WL 4735005, at *4-5 (S.D.N.Y. Sep. 27, 2019); *cf. BWP Media USA*, 69 F. Supp. 3d at 360 (dismissing RICO claim where plaintiffs merely attributed conduct to "defendants" collectively without specifying individual defendant's own conduct). "It is not enough to allege that predicate acts were committed by somebody, in furtherance of an enterprise in which the defendants were involved. Rather, to state a violation of §1962(c) by any defendant, plaintiffs must allege that *that defendant* personally committed two or more predicate acts." *Zito v. Leasecomm Corp.,* No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *13 (S.D.N.Y. Sep. 30, 2003) (emphasis added).

Western Energy fails to adequately demonstrate that Finalis participated in any of the alleged predicate acts. The Amended Complaint merely alleges that Finalis failed to "supervise or monitor" the other defendants, providing them with the opportunity to engage in the alleged acts of misappropriation. Doc. 41 ¶ 137. This is not sufficient to be considered a predicate act and surely does not demonstrate an ongoing pattern. Accordingly, the RICO claim may be dismissed against Finalis for this reason as well.

14

### B. Misappropriation of Trade Secrets under the Federal Defend Trade Secrets Act and under New York Law as against all Defendants

Finalis additionally moves to dismiss Western Energy's misappropriation of trade secrets claim, brought pursuant to both the DTSA and New York law. Under the DTSA, to allege a claim for misappropriation, a plaintiff must establish, "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group Inc.*, No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (quoting 18 U.S.C. §1839(5)). "The elements for stating a claim for misappropriation of trade secrets under New York law 'are fundamentally the same' as those sustaining a claim under the [DTSA]. If a complaint sufficiently alleges a claim under the DTSA, it also sufficiently pleads misappropriation of trade secrets under New York law." *Kraus USA, Inc. v. Magarik*, No. 17 Civ. 6541 (ER), 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (internal citations omitted). Since the requirements of the DTSA and New York law are so alike, "courts often rely on cases discussing New York law to analyze DTSA claims." *Medidata Solution, Inc. v. Veeva Systems, Inc.*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *2 (S.D.N.Y. Feb. 9, 2021).

For a plaintiff to successfully bring a trade secret misappropriation claim, "a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Democratic National Committee v. Russian Federation*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019). This claim may be shown by demonstrating that the defendant gained access to the trade secrets through "improper means" or that "the defendant improperly used or disclosed trade secrets." *Id.* (internal citation omitted). Improper means includes "theft, bribery, misrepresentation, breach or

15

inducement of a breach of duty to maintain secrecy and espionage through electronic or other means, but does not include reverse engineering, independent derivation or any other lawful means of acquisition." *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 493 (S.D.N.Y. 2024) (citing 18 U.S.C. § 1839(6)). "The statute therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Id.* (citing *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 389 (S.D.N.Y. 2023) (internal citation and quotation mark omitted)).

"A trade secret is any formula, pattern, device, or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Bancorp Services, LLC v. American General Life Insurance Company*, No. 14 Civ. 9687, 2016 WL 4916969, at *10 (S.D.N.Y. Feb. 11, 2016). "The Second Circuit 'has not squarely articulated the precise contours of the specificity requirement in the context of the trade secrets.'" *eShares, Inc.*, 727 F. Supp. 3d at 491-92. (citing *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Group, Inc.*, 68 F. 4th 792, 800 n.9 (2d Cir. 2023)). District courts in this Circuit, however, have routinely required that parties alleging misappropriation of trade secrets provide, "sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Id.* at 492. On a motion to dismiss, the party alleging that it possessed a trade secret must provide clear allegations demonstrating the information owned and its value. *Bancorp*, 2016 WL 4916969, at 11. The plaintiff is only required, however, to specify "the general contours of a trade secret," and exact specificity is not required. *Kraus*, 2020 WL 2415670, at *4.

Western Energy has sufficiently demonstrated that it possessed trade secrets. The trade secrets listed in the complaint are sufficiently specific to its business model and come from "experience and effort," which meets the definition of a trade secret. *Id.* at 6. (Finding a compilation of the customer lists to constitute a trade secret since it took considerable experience and effort to develop.); *see also Telerete Systems, Inc. v. Caro*,

16

689 F. Supp. 221, 232 (S.D.N.Y. 1988) ("Even a slight competitive edge will satisfy this requirement of trade secret protection."). Western Energy alleged that its business model was developed over a period of time, following the success of the 2017 Offering, and that it implemented various measures to protect its newly developed strategies. Thus, Western Energy's alleged trade secrets satisfy the first requirement.

Western Energy argues that Finalis was involved in the misappropriation by providing Reuss with its "name, licensure, and reputation" which Reuss used to gain Western Energy's trust and assign Reuss as the Placement Agent.[10] Next, Western Energy alleges that Reuss and Finalis agreed to the confidentiality provision in the PAA in order to gain access to the trade secrets. Finalis then allegedly exploited the trade secrets with Reuss and Cheema to create EB5 Energy's identical business model and offering. Western Energy further alleges that Finalis served as the exclusive Broker-Dealer for the new offering, knowing that it would compete directly with Western Energy. Finalis responds by arguing that these allegations are not sufficient to demonstrate that it had access to the trade secrets, used them, or disclosed them and that Western Energy's claims are unsubstantiated.

The amended complaint sufficiently alleges that Finalis had authority over Reuss. Finalis' characterization of Reuss as an independent contractor in an attempt to separate the parties from a principal/agent relationship is unavailing "because the two terms are not mutually exclusive; an independent contractor may also be an agent." *U.S. v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) (citing Restatement (Second) of Agency §14N (1958)) ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor."). Thus, the exact title of Reuss is irrelevant for the purposes of this claim. Here the PAA

---

[10] Western Energy analogizes Finalis to a security guard who lets thieves through the door to steal jewels, and argues that the guard should also be held responsible for the theft.

establishes that Reuss was acting under Finalis' authority. Reuss was appointed by Finalis, paid through Finalis, and was a registered representative of Finalis. Doc. 41.

However, the amended complaint does not sufficiently plead that Finalis *itself* had any involvement in the misappropriation of trade secrets. The language of the DTSA clarifies that some form of direct misappropriation is required through either acquisition, disclosure, or use. 18 U.S.C. § 1839(5). There are no facts alleged in the amended complaint that show that Finalis was involved in the misappropriation other than through its indirect supervision of Reuss. The Court, therefore, cannot conclude that Finalis' participation as broker-dealer alone is enough to violate the DTSA. As a result, Western Energy's misappropriation claims must be dismissed.

### C. Western Energy's State Law Claims

In addition to the Federal RICO and federal misappropriation claims, Western Energy alleges state claims against Finalis for deceptive business practices under the N.Y. General Business Law §349, breach of contract, breach of contract as principal of Reuss, and breach of the implied covenant of good faith and fair dealing. Pursuant to 28 U.S.C. §1367(c)(3), and the recent Supreme Court ruling in *Royal Canin U.S.A., Inc., v. Wullschleger*, when all federal claims have been extinguished, "the district court [is deprived of] its authority to decide the state-law claims remaining." 604 U.S. 22, 43 (2025).

Subject matter jurisdiction in the instant action is based on federal question jurisdiction. 28 U.S.C. §1331. Because no federal claims remain that are subject to a merit's determination by this Court, the Court does not retain supplemental jurisdiction to adjudicate the remaining state claims. *Id.* Therefore, all non-federal claims contained in Western Energy's complaint are hereby dismissed without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Finalis motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 49.

It is SO ORDERED.

Dated:    March 26, 2025
             New York, New York

                                                                    _____
                                                                         EDGARDO RAMOS, U.S.D.J.