UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WESTERN ENERGY OPPORTUNITIES II, LLC, d/b/a WESTERN ENERGY REGIONAL CENTER,

                Plaintiff,

– against –

FINALIS SECURITIES, LLC, EB5 ENERGY FUND I, LP d/b/a EB5 MARKETPLACE, EB5 ENERGY HOLDINGS, LLC, RUPY CHEEMA, KURT EDWARD REUSS, *and* ABC CORPORATIONS 1 through 10,

                Defendants.

**OPINION & ORDER**

24-cv-2565 (ER)

Ramos, D.J.:

      Western Energy Opportunities II, LLC d/b/a Western Energy Regional Center ("Western Energy") brings this action against Finalis Securities, LLC ("Finalis"), EB5 Energy Fund I, LP d/b/a EB5 Marketplace ("EB5 Marketplace"), EB5 Energy Holdings, LLC ("EB5 Energy"), Rupy Cheema, Kurt Edward Reuss, and ABC Corporations 1 through 10. Doc. 41. Western Energy asserts various claims, including a violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (c), misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and New York Law, and breach of contract. *Id.* Before the Court are two sets of motions: (1) EB5 Marketplace and Reuss' motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(c), or, alternatively, compelling arbitration;[1] and (2) Western Energy's motion for reconsideration of the Court's Opinion

---

[1] The motion to dismiss is purportedly made on behalf of three defendants, EB5 Energy Fund I, LP, EB5 Marketplace, and Reuss. Doc. 55. However, as noted by Western Energy, EB5 Energy Fund I, LP does business as EB5 Marketplace. Doc. 62 at 4. Thus, the Court construes the motion as on behalf of two defendants: EB5 Marketplace and Reuss.

and Order dated March 26, 2025. Docs. 55, 78. For the reasons set forth below, EB5 Marketplace and Reuss' motion to compel arbitration is GRANTED and Western Energy's motion for reconsideration is DENIED.

I. BACKGROUND

   A. Factual Background

   *1. Parties*

Western Energy is a Delaware Limited Liability Company designated as an EB-5 regional center in 2016 by the United States Citizenship and Immigration Services ("USCIS"). Doc. 41 ¶¶ 2, 15.

Finalis is a Delaware Limited Liability Company that functions as a securities brokerage firm licensed by the Financial Industry Regulatory Authority ("FINRA"). *Id.* ¶¶ 3, 32.[2]

EB5 Marketplace is a Delaware Limited Partnership. *Id.* ¶ 6.

EB5 Energy is a Delaware Limited Liability Company. *Id.* ¶ 7.

Reuss served as Western Energy's primary point of contact at Finalis and allegedly played a central part in the theft of Western Energy's trade secrets. *Id.* ¶ 4.

Cheema is married to Reuss, allegedly played a central part in the theft of Western Energy's trade secrets, and is the face of an entity currently operating and using Western Energy's trade secrets. *Id.* ¶ 5.[3]

   *2. The EB-5 Program*

The EB-5 program was created by Congress with the passing of the Immigration Act of 1990 with the goal of stimulating and incentivizing foreign entrepreneurial investment in the United States economy. *Id.* ¶ 12. The program allows foreign investors to obtain an EB-5 visa, which entitles the holder to obtain a conditional Green Card, and

---

[2] FINRA is a self-regulatory organization under the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78a).

[3] The amended complaint does not specify which entity, but based on other allegations in the amended complaint, the Court assumes it is EB5 Energy. *See* Doc. 41 ¶¶ 68, 88.

after two years, a full Green Card. *Id.* ¶ 13. After five years of Green Card status, investors may apply for full United States citizenship. *Id.* For a foreign investor to qualify for the EB-5 program, his investment in a qualified EB-5 project must be $800,000 or greater and create at least ten jobs in the United States. *Id.*

   3. *Western Energy's Business Model and 2017 Offering*

Western Energy accrues profits from EB-5 investments and uses the profits to pay back its capital investors, plus interest. *Id.* ¶¶ 20, 21. From 2016 to 2017, Western Energy raised $3,000,000 in a single offering from six investors, generating approximately $4,000,000 in revenue over the course of the following five years (the "2017 Offering"). *Id.* ¶ 26.

Following the 2017 Offering, Western Energy worked on establishing its business model and gaining contacts with potential investors. *Id.* ¶ 27. Western Energy also took reasonable precautions to protect its model and trade secrets. *Id.* ¶ 29. For example, Western Energy required all individuals with access to its confidential information to sign a non-disclosure and confidentiality agreement or agree to a similar provision in their contract granting said individual access. *Id.* Western Energy also numbered each set of offering documents as a way to track their movements, including identifying markers on marketing materials, sharing documents in read-only formats, and maintaining confidential information in password protected devices/accounts. *Id.*

Western Energy's alleged trade secrets, included:
- Information relating to the varying sizes and types of oil wells in Oklahoma;
- Data relating to the historical production and financial performance of the same;
- Information relating to the geographical features and locations in Oklahoma that indicate a likelihood of a productive oil well;
- Information relating to the selection of oil and gas operators in Oklahoma;
- Proven strategies for optimizing an oil and gas investment to create jobs, and therefore, meet the job creation requirements for EB-5 investor visa applications;

3

- Strategies for diversifying portfolios of oil wells to maximize returns for both Western Energy and investors;
- Data relating to proven oil reserves and the likelihood of similar or differing outcomes with those reserves or in those regions;
- Proven strategies for oil field redevelopment;
- Strategies for optimizing investors' and owners' federal income tax using a specific combination of investment structure, tax incentives, and distributions;
- Information regarding new extraction technologies and the operators that are using them;
- An investment and return structure that shortens the timeline for return of investors' capital;
- Prospectus and other offering documents;
- Marketing materials and strategies;
- Lists of oil and gas operators;
- Contacts at various immigration agencies across numerous eastern Asian countries; and
- Due diligence checklists related to the projects, immigration agencies, and vetting of investors.

*Id.* ¶ 28.

4. *2022 Offering & the PAA*

After years of developing its business model, Western Energy contacted Finalis, a brokerage firm, in preparation for another offering (the "2022 Offering"). *Id.* ¶¶ 30, 32.

In August 2022, Western Energy began working with Finalis with the goal of generating quicker investments, facilitating connections with prospective investors, and assisting with compliance services related to the oversight of its EB-5 program. *Id.* ¶¶ 31–32, 42.

In August 2022, Western Energy, Finalis, and Reuss entered into a Placement Agent Agreement ("PAA"), with Western Energy as the Issuer, Reuss doing business as EB5 Marketplace as the Placement Agent, and Finalis as the Registered Broker-Dealer.

*Id.* ¶ 39; Doc. 41-1 at 16. Reuss[4] served as Western Energy's primary point of contact at Finalis and served as the Placement Agent/Broker pursuant to the PAA. Doc. 41 ¶¶ 4, 39; *see* Doc. 41-1.[5]

The PAA stated that Western Energy's goal in working with Finalis was to "conduct an offering to raise up to [$79,200,000.00] from certain prospective qualified investors … each of whom intends to apply for approval from the [USCIS] for an I-526 Immigrant Petition by Alien Entrepreneur … through the EB-5 Immigrant Investor Program." Doc. 41 ¶ 41; *see* Doc. 41-1 at 1. Reuss was appointed to solicit and refer qualified investors to Western Energy with Finalis as a signatory, serving as the Registered Broker-Dealer. Doc. 41 ¶ 42. Reuss often included Cheema in conducting due diligence. *Id.* ¶ 52.[6] Cheema initiated information and documentation requests on behalf of EB5 Marketplace. *Id.* The PAA also included compensation agreements between Western Energy and Finalis, which provided that Western Energy would pay Finalis on behalf of Reuss. *Id.* ¶¶ 45–46.[7]

Western Energy trusted Finalis due to its industry reputation, SEC registration, FINRA membership, and representations in the PAA, and thus turned over confidential information to Reuss and Cheema pursuant to the PAA. *Id.* ¶ 58. Western Energy assumed that the information provided to Cheema would be used solely in furtherance of the goals of the PAA. *Id.*

---

[4] The PAA, which is attached as an exhibit to the amended complaint, identifies Reuss as a "registered representative of Finalis Securities LLC." Doc. 41-1 at 17.

[5] As the Placement Agent, Reuss was obligated to comply with FINRA rules. Doc. 41-1 at 6.

[6] Western Energy paid in excess of $35,000 in due diligence fees to Reuss. Doc. 41 ¶ 53.

[7] Western Energy was required to pay Finalis a percent of the total amount invested by a qualified investor minus $10,000—the administrative fee charged by Western Energy for each investor introduced by the Placement Agent. Doc. 41 ¶ 46. This administrative fee would be paid to Western Energy by the investor within 10 days of the investor's receipt of notice from the USCIS of that investor's I-526 petition. *Id.*

In addition, the PAA provided that Finalis was to be paid a fee of 3.5% of the total capital invested by each qualified investor placed by Reuss, which was to be paid annually for five years following the placement. *Id.* ¶ 47.

The PAA required Finalis and Reuss to acknowledge they would have "access to [c]onfidential [i]nformation relating to the business of [Western Energy] and the [p]roject, including, but not limited to, sales and marketing information, [o]ffering [d]ocuments, financial information, business plans, or other material embodying trade secrets, or other information or technical or business information of [Western Energy] or the [p]roject" and to agree that "at all times from and after the [e]ffective [d]ate to exercise due care and keep in confidence and not disclose or otherwise exploit [c]onfidential [i]nformation." *Id.* ¶ 48. Additionally, as the Registered Broker-Dealer, Finalis was required to comply with FINRA Rules 3010, 3270, and 3280, which require that Finalis have systems in place to monitor its representatives' outside business activities and assess whether its representatives can serve the client adequately. *Id.* ¶ 59.

The PAA also contains an arbitration provision:

> 7. <u>Arbitration.</u>  This agreement contains a predispute arbitration clause.  By signing an arbitration agreement, the parties agree as follows: … The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.  Any controversy or claim arising out of or relating to this [a]greement, or the breach thereof, shall be settled by arbitration administered by FINRA.  The number of arbitrators shall be one.  The place of arbitration shall be New York, New York, and New York law shall apply.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The parties agree to submit to the personal jurisdiction of the state and federal courts located in the State of New York, and consent to service of process in any manner authorized by New York law.  Should any legal proceeding be necessary to construe or enforce the provisions of the [PAA], then the prevailing party in such legal action shall be entitled to recover all court costs, reasonable attorney fees, and costs of enforcing or collecting any judgment awarded.

Doc. 41-1 at 12–13.[8]

---

[8] In a footnote in the amended complaint, Western Energy notes the following:  Western Energy "is cognizant of the provision in the PAA which provides that disputes arising from a breach of the PAA are subject to a limited arbitration provision.  However, any breach of contract claims as against Finalis, Reuss[,] and EB5 Marketplace (the parties to the PAA) that those defendants could argue should be subject to the provision are supplemental and secondary to this complaint's Federal RICO, State and Federal

6

Pursuant to the PAA, Western Energy provided Reuss and Cheema with sales and marketing materials, offering documents, financial information, business plans, tax documents and strategies, asset structure and pooling strategies, and lists of industry contacts. *Id.* ¶ 53.

Six months after entering into the PAA, Reuss had only placed four qualified investors with Western Energy, raising a total of only $3.2 million, which required restructuring the 2022 Offering. *Id.* ¶ 54. Instead of focusing on fulfilling his obligations as the Placement Agent, Reuss allegedly initiated a scheme with Finalis, Cheema, EB5 Marketplace, and EB5 Energy to steal Western Energy's trade secrets and create a competing business. *Id.* ¶ 55.

At some point, Western Energy noticed that an entity named Reuss Capital Group, LLC, believed to be the parent company of EB5 Marketplace and EB5 Energy, was sending out marketing materials that were very similar, if not identical, to the ones used by Western Energy. *Id.* ¶ 66.

In April 2023, Western Energy learned that EB5 Energy was raising investments for an oil and gas offering in Oklahoma. *Id.* ¶¶ 67, 71.[9] Specifically, Western Energy learned from a marketing agency operating in Ho Chi Minh City, Vietnam, that there was a competing regional center participating in an EB-5 trade show in Ho Chi Minh City. *Id.* ¶ 67. The contact at the marketing agency sent photos to Western Energy of Cheema at the display booth which depicted the competing regional center as EB5 Energy. *Id.* ¶ 68.[10]

---

Misappropriation of Trade Secrets, and Deceptive Business Practices as against all parties (including those not privy to the PAA). Because the substance of the claims made herein and several parties hereto fall outside the scope of the arbitration provision, and competing proceeding could result in inconsistent outcomes, resolution of all claims together, in this Court, is appropriate." Doc. 41 at 9 n.2.

[9] For seven years, Western Energy and EB5 Marketplace coexisted in the EB-5 industry without overlap, with Western Energy being the sole EB-5 Regional Center dealing with the oil and gas industry in Oklahoma and EB5 Marketplace primarily dealing with commercial real estate projects. Doc. 41 ¶ 70.

[10] Western Energy's online research revealed that Cheema was leading EB5 Energy. Doc. 41 ¶ 68.

At some point, after receiving Western Energy's confidential trade secrets while doing due diligence on the 2022 Offering, EB5 Marketplace's business model changed to mimic Western Energy's business model. *Id.* ¶ 73. EB5 Marketplace utilized Western Energy's trade secrets, by using Western Energy's: (1) offering structure to create a near-identical structured offering, (2) list of partners and operators to find approved EB-5 projects in the oil and gas industry, (3) format of a prior offering to ensure legal and regulatory compliance, (4) tax structure of a prior offering to maximize its and its investors returns, and (5) brochures, subscription agreements, and other materials for its own offering. *Id.* ¶¶ 74–78, 80. EB5 Marketplace also contacted potential investors from Western Energy's confidential client lists and placed them into its own offering. *Id.* ¶ 79.

On April 26, 2023, EB5 Energy was formed, and for the first time, EB5 Marketplace began raising funds for an oil and gas offering. *Id.* ¶ 71.

Around the same time as Western Energy's 2022 Offering, EB5 Marketplace obtained between 20 to 30 qualified investors, raising between $16 and $24 million. *Id.* ¶ 82. Western Energy alleges that each of these investors was diverted from the 2022 Offering by Reuss, Cheema, and Finalis to the detriment of Western Energy. *Id.* ¶ 83.

When Western Energy learned of EB5 Marketplace's offering, it contacted Finalis. *Id.* ¶ 84. Finalis did not answer Western Energy's emails and took no immediate steps to investigate or remedy the situation. *Id.* ¶¶ 85–86. When Western Energy confronted Reuss on the matter, he did not deny the allegations and instead stated that EB5 Energy was run by his wife, not him. *Id.* ¶ 88.

Finalis also entered into an agreement with EB5 Marketplace for the same services that Finalis had been providing to Western Energy, using the same business model as Western Energy, as seen in a screenshot taken from EB5 Marketplace's website, on its "Rural Energy (Oklahoma)" page which states that, "[s]ecurities are offered through Finalis Securities LLC Member FINRA/SIPC." *Id.* ¶ 86 (Image 1).

B. **Procedural History**

Western Energy filed this action on April 4, 2024, alleging: (1) RICO, 18 U.S.C. § 1964(c), (2) misappropriation of trade secrets under the DTSA and under New York law, (3) deceptive business practices under New York General Business Law § 349, (4) breach of contract, and (5) breach of the implied covenant of good faith and fair dealing. Doc. 1. On May 10, 2024, EB5 Marketplace and EB5 Energy answered the complaint. Doc. 23. On May 22, 2024, the Clerk of Court issued certificates of default as to Reuss and Cheema, and on May 24, 2024, Cheema and Reuss answered the complaint. Docs. 30, 31, 33.

Western Energy amended the complaint on July 23, 2024. Doc. 41. On August 7, 2024, EB5 Marketplace, EB5 Energy, Cheema, and Reuss answered the amended complaint. Docs. 43, 44. On August 14, 2024, Finalis moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 49. At a pre-motion conference, on August 21, 2024, the Court granted EB5 Marketplace, EB5 Energy, Cheema, and Reuss' leave to file a motion to dismiss pursuant *only* to Rule 12(c) because they had each filed answers. August 21, 2025 Minute Entry.[11] Notwithstanding the Court's direction, on September 10, 2024, EB5 Marketplace and Reuss moved to dismiss the amended complaint pursuant to Rules 12(b)(1), 12(b)(6), and 12(c), or, alternatively, to compel arbitration. Doc. 55. EB5 Marketplace and Reuss also requested that the Court stay the action pending the completion of the arbitration if the Court compels arbitration. *Id.* That same day, Western Energy filed a letter noting that the Court previously directed EB5 Marketplace and Reuss to file a motion only pursuant to Rule 12(c) and that EB5 Marketplace and Reuss impermissibly filed their motion *also*

---

[11] Fed. R. 12(b) states that "[a] motion asserting any of [12(b)] defenses must be made before pleading if a responsive pleading is allowed." *See NYMET Industrial Solutions v. Maersk, Inc.*, 818 F. Supp. 2d 511, 512 (E.D.N.Y. 2011) ("By answering first, Defendant waived its right to seek dismissal under Rule 12(b)."); *see also Cheng v. Department of Justice*, No. 23-cv-3983 (AT) (GS), 2024 WL 818101, at *4 (S.D.N.Y. Feb. 23, 2024), report and recommendation adopted, No. 23-cv-3983 (AT) (GS), 2024 WL 1178986 (S.D.N.Y. Mar. 19, 2024) "[A]ny Rule 12(b) motion, even one for lack of subject-matter jurisdiction under Rule 12(b)(1), is untimely if made after the defendant's answer is filed.").

pursuant to Rules 12(b)(1) and 12(b)(6). Doc. 56. The next day, the Court issued an order, noting that the Court would construe EB5 Marketplace and Reuss' motion as a motion for judgment on the pleadings pursuant to Rule 12(c). Doc. 57. On October 16, 2024, Finalis, which was still a defendant at the time, filed a letter joining Western Energy's opposition to EB5 Marketplace and Reuss' motion in part. Doc. 64. On March 26, 2025, the Court granted Finalis' motion to dismiss ("March 2025 Opinion"), dismissing Finalis as a defendant in this action. Doc. 77. On April 9, 2025, Western Energy filed a motion for reconsideration as to the March 2025 Opinion. Doc. 78.

## II.  LEGAL STANDARD

### A. Motion to Compel Arbitration

"The Second Circuit has recognized that, depending on the facts and arguments presented, a motion to dismiss based on an arbitration provision may be treated as a motion to compel arbitration[.]" *Begonja v. Vornado Realty Trust*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016) (citing *Wabtec Corp. v. Faiveley Transportation Malmo AB*, 525 F.3d 135, 139–40 (2d Cir. 2008)). The motion must either "explicitly or implicitly ask[ ] the court to order arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). Where such a request is made and a movant thus manifests "an intent ... to compel arbitration," the Court may "treat[ ] motions to dismiss based on mandatory arbitration clauses as motions to compel arbitration." *Id.* at 230 & n.3; *see Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 101 n.3 (2d Cir. 2022). Here, the arguments in EB5 Marketplace and Reuss' motion to dismiss the amended complaint or, alternatively, compelling arbitration are based entirely on enforcing the arbitration provision in the PAA. *See* Doc. 55-1. Accordingly, the Court will treat the motion to dismiss as a motion to compel arbitration.

Pursuant to the Federal Arbitration Act ("FAA"), a written agreement to arbitrate disputes is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. This reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563

10

U.S. 333, 346 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts," *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). But parties are not required to arbitrate unless they agreed to do so. *Schnabel*, 697 F.3d at 118 (citation omitted). Thus, before an agreement to arbitrate can be enforced, the court must first determine whether an agreement to arbitrate exists. *Id.* This question is governed by contract law. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019).

If the Court concludes that the parties agreed to arbitrate, "it should then consider whether the dispute falls within the scope of the arbitration agreement." *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 26 (2d Cir. 2002)). If the dispute falls within the scope of the arbitration agreement, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y.C. District Council of Carpenters' Pension Fund*, No. 7-cv-1951 (WCC), 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

On a motion to compel arbitration, the Court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with … affidavits and draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (internal quotation marks and citations omitted). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022) (citation omitted).

B. Motion for Reconsideration

The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners,*

11

*L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). "A motion for reconsideration should be granted only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation marks and citation omitted). It is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys*, 684 F.3d at 52 (citation omitted). The decision to grant or deny the motion for reconsideration is within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

### III.    DISCUSSION

#### A. Motion to Compel Arbitration

EB5 Marketplace and Reuss argue that the arbitration provision in the PAA requires that this action should be decided by an arbitrator, not this Court. Doc. 55-1 at 2. Accordingly, the Court will address (1) whether the parties agreed to arbitrate pursuant to the PAA and (2) what claims, if any, falls within the scope of the PAA.

*1. Agreement to Arbitrate*

Although the parties do not dispute that the PAA has a valid arbitration provision, they dispute which parties are bound by the provision. *See* Doc. 55-1 at 2; Doc. 62 at 11–12. The signatories to the PAA were Western Energy, Reuss doing business as EB5 Marketplace, and Finalis. Doc 41-1 at 16. Western Energy argues that EB5 Marketplace is not a party to the agreement because it is not its own entity. Doc. 62 at 11–12.[12] Here, the PAA specifies Reuss doing business as EB5 Marketplace as a signatory, so the Court considers both Reuss and EB5 Marketplace as parties to the PAA. *See* Doc. 41-1 at 16. Thus, Western Energy, Reuss, EB5 Marketplace, *and* Finalis have agreed to arbitrate.

---

[12] In the amended complaint, however, Western Energy alleges that EB5 Marketplace is a party to the PAA. Doc. 41 at 9 n.2.

However, Cheema and EB5 Energy, the other two defendants in this action, are not signatories to the PAA, so they are not bound by the agreement to arbitrate. *See id.* Accordingly, the PAA applies to EB5 Marketplace and Reuss.[13]

2. *Scope of Agreement*

EB5 Marketplace and Reuss argue that FINRA, not this Court, is "the proper forum to decide what claims are arbitrable" because the PAA states any claim or controversy "shall be settled by arbitration administered by FINRA." Doc. 55-1 at 9.[14] In opposition, Western Energy argues that the Court should determine arbitrability because the arbitration provision "makes no express reference to which forum decides the arbitrability of claims." Doc. 62 at 16.

"In determining whether a claim falls within the scope of a mandatory arbitration clause, there is a general presumption that courts, not arbitrators, decide issues of arbitrability." *KPA Promotion & Awards, Inc. v. JPMorgan Chase & Co.*, No. 20-cv-03910 (NRB), 2021 WL 1317163, at *4 (S.D.N.Y. Apr. 8, 2021) (citing *Telenor Mobile Communications AS v. Storm LLC*, 584 F.3d 396, 406 (2d Cir. 2009)). However, this presumption can be rebutted with "clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (internal quotation marks, citation, and emphasis omitted). "Clear and unmistakable evidence exists when an arbitration clause explicitly delegates arbitrability determinations to the arbitrator, or when it incorporates

---

[13] Western Energy argues that EB5 Marketplace and Reuss do not have authority to compel arbitration on behalf of Finalis, the other defendant who is a party to the PAA. Doc. 62 at 14. Here, the Court has already dismissed Finalis as a defendant in this action. Accordingly, the Court will only analyze whether the claims against EB5 Marketplace and Reuss are arbitrable.

[14] Prior to being dismissed from this action, Finalis filed a letter joining Western Energy's opposition, in part, on October 16, 2024. Doc. 64. Finalis requested that the action proceed in this Court and that the motion to compel arbitration be denied. *Id.* at 1–2. Finalis argued that "the substance of the underlying claims cannot litigated in a proceeding to which [] Cheema is not a party" because the allegations against Cheema make her on "'indispensable party' to each and every count in this action." *Id.* at 1.

by reference arbitration rules that do so." *Arshad v. Transportation Systems, Inc.*, 183 F. Supp. 3d 442, 446 (S.D.N.Y. 2016) (citing *Contec Corp.*, 398 F.3d at 208).

      The Second Circuit has held that, where an arbitration provision incorporates rules under which an arbitrator decides issues of arbitrability, clear and unmistakable evidence exists that the parties intended an arbitrator, not the courts, to decide the threshold issue of arbitrability. *See Contec Corp.*, 398 F.3d at 208. FINRA Rule 13413 states that the arbitration "panel has the authority to interpret and determine the applicability of all provisions under this Code." "Thus, the FINRA Rules empower an arbitrator to decide issues of arbitrability." *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 288 (S.D.N.Y. 2019) (citations omitted). Accordingly, arbitration provisions incorporating FINRA rules, coupled with a broad arbitration clause, demonstrate a clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator. *See Contec Corp.*, 398 F.3d at 208, 211 (holding that an arbitration clause agreeing to submit to arbitration "any controversy arising with respect to" the agreement and incorporating the AAA rules constituted clear and unmistakable evidence of intent to arbitrate arbitrability); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 429 (E.D.N.Y. 2014) (finding that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability") (citations omitted).

      In addition, "[b]road language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability, and the clearer it is from the agreement that the parties intended to arbitrate the particular dispute presented, the more logical and likely the inference that they intended to arbitrate the arbitrability of the dispute." *Metropolitan Life Insurance Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019); *see also Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 394, 396 (2d Cir. 2018) (An arbitration clause expressing agreement "to arbitrate any dispute, claim or controversy that may arise between you and Wells Fargo Advisors, or a client, or

14

any other person[, and] ... giving up the right to sue Wells Fargo Advisors ... in court concerning matters related to or arising from your employment" "demonstrate[d] the parties' clear and unmistakable intent to arbitrate all questions of arbitrability.").

Here, the arbitration provision clearly states that "[a]ny controversy or claim arising out of or relating to the [PAA], or breach thereof, shall be settled by arbitration administered by FINRA." Doc. 41-1 at 13. Due to the broad arbitration provision and the reference to FINRA rules in the PAA, the Court finds that there exists clear and unmistakable evidence of the parties' intent to submit the question of arbitrability to an arbitrator. *See Citadel Servicing Corp.*, 431 F. Supp. 3d at 288–89; *Contec Corp.*, 398 F.3d at 208, 211; *Paduano*, 55 F. Supp. 3d at 429. Accordingly, the arbitrator, and not the Court, must decide whether the claims against EB5 Marketplace and Reuss are subject to arbitration.

### 3. The Action is Stayed Pending Arbitration

As the Second Circuit has held, "if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *JLM Industries, Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (internal citation omitted); *see also Abdullayeva v. Attending Homecare Services LLC*, 928 F.3d 218, 221–22 (2d Cir. 2019). "The decision to grant a stay falls within the discretion of the trial court as a means of controlling its docket." *Senisi v. John Wiley & Sons, Inc.*, No. 13-cv-3314 (LTS) (AJP), 2015 WL 256094, at *6 (S.D.N.Y. Jan. 21, 2015). "The Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, No. 10-cv-8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y Apr. 15, 2011) (citation omitted). A stay is particularly appropriate if the arbitrable claims and non-arbitrable claims are factually connected, such that a stay would "promote judicial economy, avoidance of confusion and possible inconsistent results." *Champion Auto Sales, LLC v.*

15

*Polaris Sales Inc.*, 943 F. Supp. 2d 346, 355 (E.D.N.Y. 2013) (quoting *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)); *see also Moore v. Interacciones Global, Inc.*, No. 94-cv-4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants.") (citations omitted).

EB5 Marketplace and Reuss ask the Court to stay this action in its entirety pending the completion of arbitration while Western Energy asks the Court to stay arbitration until the Court resolves the non-arbitrable claims. Doc. 55-1 at 10; Doc. 62 at 14, 17. Here, although the Court only refers the claims of two defendants to arbitration, the Court will stay the action pending arbitration because there is significant factual overlap among the claims. *See e.g.*, *Kim v. Evergreen Adult Day Care in NY Inc.*, No. 22-cv-548 (AMD) (CLP), 2024 WL 989909, at *6–*7 (E.D.N.Y. Mar. 6, 2024). A stay of the Western Energy's non-arbitrable claims will "avoid piecemeal litigation and lead to a more expeditious, economical resolution of the dispute." *Chang v. United Healthcare*, No. 19-cv-3529 (RA), 2020 WL 1140701, at *5–*6 (S.D.N.Y. Mar. 9, 2020); *see Maritima de Ecologia*, 2011 WL 1465744, at *5 (citation omitted).

### B. Motion for Reconsideration

Western Energy argues that the March 2025 Opinion (1) overlooked allegations showing Finalis' active involvement under the DTSA, and (2) improperly interpreted liability under the DTSA. Doc. 78 at 8–12. Western Energy also requests leave to amend the complaint if the Court denies its motion. *Id.* at 12–13.

#### 1. *Lack of Involvement in the Alleged Misappropriation of Trade Secrets*

Western Energy argues that the Court overlooked key factual allegations showing that "Finalis knowingly facilitated, endorsed, and benefited from the misappropriation in a manner cognizable under the DTSA." Doc. 78 at 8. In the March 2025 Opinion, the

16

Court considered the very same factual allegations raised *again* by Western Energy and concluded that the amended complaint did not sufficiently plead that Finalis itself had any involvement in the misappropriation of trade secrets. Doc. 77 at 18.[15] Specifically, the Court explained that Western Energy did not allege facts that "show that Finalis was involved in the misappropriation other than through its indirect supervision of Reuss." *Id.* Accordingly, Western Energy does not identify any well-pled allegations overlooked by the Court as to the misappropriation of trade secrets claim.

2. *Properly Interpreted Liability under the DTSA*

Western Energy argues that the DTSA does not require *direct* acquisition, disclosure, or use where the defendant facilitates and benefits from misappropriation. Doc. 78 at 9, 11. However, as the Court already explained in the March 2025 Opinion, "the language of the DTSA clarifies that some form of direct misappropriation is required through either acquisition, disclosure, or use." Doc. 77 at 18 (citing 18 U.S.C. § 1839(5)). In addition, the cases cited by Western Energy do not support its argument because they had some form of *direct* misappropriation. For example, Western Energy cites to *In Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group, Inc.*, No. 15-cv-211 (LGS) (RLE), 2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016), arguing that the court "recognized that a defendant may misappropriate secrets by inducing or benefiting from another's breach of confidentiality." Doc. 78 at 9.[16] However, as Finalis explains, *Syntel* did not hold that a defendant can be liable under the DTSA from inducing or benefiting from another's breach of confidentiality, and instead held that the defendant adequately

---

[15] Finalis notes that the Court considered all the same factual allegations to reach the conclusion that Finalis was not involved in the alleged misappropriation with the "exception of the *conclusory* allegation that Finalis knew or should have known about Reuss' conflict of interest under the PAA due to its role as the broker-dealer." Doc. 80 a 10. In the March 2025 Opinion, the Court did consider this allegation in reaching its conclusion. And "just because [the] [C]ourt does not specifically reference every factual detail … to which [Western Energy] attaches special significance does not necessarily establish that the Court did not consider that particular matter." *See In re CRM Holdings, Ltd. Securities Litigation*, No. 10-cv-00975 (RPP), 2013 WL 787970, at *5 n.6 (S.D.N.Y. Mar. 4, 2013) (citation omitted).

[16] Finalis argues that Western Energy's "intentional misrepresentation of legal authority is unacceptable and warrants sanctions." Doc. 80 at 12 n.10. At this time, the Court will not impose sanctions.

17

pled a counterclaim for misappropriation under DTSA where it alleged that plaintiff downloaded confidential information and used it for *its own use and financial gain.* 2016 WL 5338550 at *6. Western Energy also cites to *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482 (S.D.N.Y. 2024), arguing that the court in *Talton* explained that the DTSA "contemplates misappropriation by one, while not the original thief, knowingly benefits from the theft." Doc. 78 at 11. However, as Finalis points out, *Talton* did not address liability for a party who benefits from another's theft and instead involved a defendant, plaintiff's former employee, that *directly* misappropriated. 727 F. Supp. 3d at 494; *see also* Doc. 80 at 13. Specifically, *Talton* found that transferring trade secrets "to a personal account can constitute acquisition by improper means under the DTSA when two elements are met: (1) the employee was directed not to share the information outside of employer-issued devices … ; and (2) the employee transferred the information outside of an employer-issued device for an improper or illegitimate purpose." *Id.*[17] Accordingly, the Court properly interpreted liability under the DTSA.

  3. *Leave to Amend*

As a general rule, leave to amend a complaint should be freely granted. *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). District courts have "broad discretion in deciding whether to grant leave to amend." *Pasternack v. Laboratory Corp. of America*, 892 F. Supp. 2d 540, 549 (S.D.N.Y. 2012) (citation omitted). The court may decline to provide the opportunity to amend if the court finds that the plaintiff "cannot correct the defects in the federal claims" and therefore "any attempt to amend the pleading ... would be futile." *Shorter v. Rice*, No.

---

[17] Western Energy also cites in *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328 (S.D.N.Y. 2023), arguing that the court "reaffirmed that a DTSA claim can proceed where a defendant 'knew or had reason to know' the secrets at issue were taken through improper means and used them to gain a commercial advantage." Doc. 78 at 11. However, the conclusory allegations in the amended complaint cited by Western Energy do not support an inference that Finalis "knew or had reason to know" of any alleged wrongdoing. *See* Doc. 41 ¶¶ 82–83.

18

12-cv-111 (JFB) (ETB), 2012 WL 1340088, at *4–*5 (E.D.N.Y Apr. 10, 2012); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted).

Western Energy requests leave to amend the complaint to cure deficiencies. Doc. 78 at 12. Finalis opposes Western Energy's request, arguing that Western Energy "offers no new facts addressing the core defects the Court already identified: the absence of any plausible, non-speculative allegation that Finalis directly participated in or knowingly benefited from the alleged misappropriation." Doc. 80 at 14.

"It is well-settled that when seeking leave to amend, the movant must submit 'a complete copy of the proposed amended complaint ... so that both the Court and the opposing party can understand the exact changes sought.'" *Akran v. United States*, 997 F. Supp. 2d 197, 207 (E.D.N.Y.) (citations omitted). Here, Western Energy failed to attach a proposed amended complaint or explain what the proposed changes would even entail of. Accordingly, Western Energy's request is denied.

### IV.   CONCLUSION

For the foregoing reasons, EB5 Marketplace and Reuss' motion to compel arbitration is GRANTED and Western Energy's motion for reconsideration is DENIED. This action is hereby STAYED pending arbitration, and the parties are directed to advise the Court within 48 hours of the outcome of the arbitration. The Clerk of Court is respectfully directed to terminate the motions, Docs. 55 and 78, and stay the case.

It is SO ORDERED.

Dated:   August 14, 2025
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.